## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

KALLIOPI KATSIS,          )
                                  )
        Plaintiff,       )
                                  )     Case No. 23 CV 397
                                  )
        v.                   )
                                  )     Judge John Robert Blakey
ABSOLUTE RESOLUTIONS   )
INVESTMENTS, LLC,       )
                                  )
        Defendant.    )

## <u>MEMORANDUM OPINION AND ORDER</u>

This matter comes before the Court on the parties' cross-motions for summary judgment. [65], [83]. For the reasons explained below, the Court grants in part, and denies in part, both Plaintiff's and Defendant's cross motions for summary judgment, respectively.

### I.    Background

Plaintiff Kalliopi Katsis, an Illinois resident, incurred a debt via the use of a credit card issued by Citibank, N.A. [21] at 2; [87] ¶ 1. Defendant Absolute Resolution Investments, LLC ("ARI") maintains a collection agency license from the State of Illinois. [91] ¶ 5. After Plaintiff defaulted, Citibank sold the debt to Icon Equities LLC ("Icon"), and then Icon in turn sold it to Defendant ARI. *Id.* ¶ 9. In 2020, Defendant sued to collect the debt (the "Collection Litigation") and obtained a default judgment against Plaintiff. *Id.*; [87] ¶ 4. Defendant "does not dispute that the subject account constitutes a 'debt,' that Plaintiff constitutes a 'consumer,' and

1

that ARI constitutes a 'debt collector'" as each of those terms are defined by the Fair Debt Collections Practices Act ("FDCPA"), 15 U.S.C. § 1692a. [92] at 2 n.2; [91] ¶ 4.

In or about August 2022, Plaintiff hired attorney Mario Kris Kasalo to quash service in the Collection Litigation, settle the default judgment obtained against her, and prosecute potential claims against Blitt & Gaines, P.C. ("Blitt"), Barrister Investigations & Filing Service, Inc., and ARI regarding the Collection Litigation default judgment. [87] ¶ 5. Plaintiff executed an Authorization and Retainer Agreement with her attorney which required her to pay a $1,000 flat fee to Mr. Kasalo's firm; she paid the fee on October 13, 2022. *Id.* ¶¶ 6, 7. ARI authorized Blitt, through its attorney Mike Starzec, to negotiate a settlement with Plaintiff and other parties involved with the matter. *Id.* ¶ 9; [91] ¶ 16.

On November 4, 2022, the parties entered into a Settlement Agreement ("Release"). [87] ¶ 10; [91] ¶ 14. The Release provided in part that:

> 1.  (a) Within thirty (14) [sic][1] days of receipt by Blitt on behalf of the Parties, of both (a) a counterpart original of this Agreement signed by [Plaintiff] and (b) a W-9 executed by [Plaintiff's] attorney . . . [Plaintiff] shall be paid . . . the 'Settlement Amount' . . .
>
> 7.  A prevailing party shall be entitled to an award of attorneys' fees and costs in any action commenced to enforce this Release or any provision therein.
>
>    . . .
>
> 16.  After receipt of a fully executed copy of this Release ARI will, within 14 days thereafter, request that the national credit reporting agencies (the 'Credit Bureaus') to which it reports delete ARI's reporting of the trade line(s) associated with the Debt . . . [Plaintiff] agrees that ARI's sole obligation with respect to credit reporting shall be to submit the request to remove ARI's

---

[1] The parties appear to acknowledge this discrepancy, *see* [87] ¶ 11, and agree that they intended this paragraph to provide for a 14-day period.

reporting of the trade line(s) associated with the Debt, and to provide [Plaintiff's] counsel a copy of the same upon submission.

[84] at 68–70.

On November 4, 2022, counsel for Plaintiff emailed Mr. Starzec Plaintiff's executed copy of the Release and an executed IRS Form W-9. [87] ¶ 12. That same day, Mr. Starzec emailed General Counsel for Defendant, Greg Woodford, a copy of the Release executed by both Plaintiff and Blitt. *Id.* ¶ 13. On November 7, 2022, Mr. Woodford executed the Release and emailed a copy of the Release executed by ARI to Mr. Starzec. [91] ¶ 24; [64-4] ¶ 13. The attached copy still required a signature from another party to the Release. [64-4], Ex. 4. In the email, Mr. Woodford asked Starzec to "send me a copy of the fully executed agreement when you have it . . . . That way we know when to submit the deletion request to the credit bureaus." *Id.* On November 11, 2022, Starzec emailed Plaintiff's counsel a copy of the fully executed Release. [87] ¶ 16; [91] ¶ 25.

Defendant claims Starzec failed to email Woodford a copy of the fully executed Settlement Agreement until January 24, 2023. *See* [87] ¶ 20; [64-4], Ex. 5. Plaintiff disputes the significance of this point. But the parties agree that Defendant submitted a tradeline deletion request to the Credit Bureaus on January 24, 2023. [91] ¶ 35. Defendant admits that although "the Release was fully executed on or before November 11, 2022 and in Blitt's possession on or before that date," Defendant "communicated to the Equifax, Experian and TransUnion credit reporting agencies that the alleged debt still existed on at least a monthly basis from November, 2022 to January 2023." [91] ¶ 33. Defendant also admits it "continued to credit report the

3

Debt until January 24, 2023," when it submitted a tradeline deletion request to the Equifax, Experian and TransUnion credit reporting agencies. [87] ¶ 22.

In late December 2022, Plaintiff and her attorney pulled her credit report and discovered that the debt continued to be reported. *Id.* ¶ 32. Afterwards, on January 18, 2023, Plaintiff entered into a second Authorization and Retainer Agreement with her attorney, Mr. Kasalo, to pursue the matter. *Id.* ¶ 33. This agreement required Plaintiff to pay Mr. Kasalo's firm a $100 flat fee and any costs for postage incurred in connection with communicating with the credit reporting agencies. *Id.* ¶ 34. Around that same time, Plaintiff's attorney prepared and submitted a reinvestigation request to TransUnion seeking deletion of the tradeline; the parties dispute whether Plaintiff personally helped. [91] ¶ 36; [87] ¶ 36. As a result of that submission, on January 27, 2023, TransUnion responded to Plaintiff's dispute and informed her that the tradeline relating to the debt had been deleted. [87] ¶ 37; [91] ¶ 38.

On January 23, 2023, in the time between the submission of her dispute with TransUnion and its ultimate resolution, Plaintiff filed this lawsuit against ARI. *See* [1]. In her Complaint, Plaintiff alleged that Defendant violated the Fair Debt Collection Practices Act by seeking to collect a nonexistent debt, breach of contract, violation of the Illinois Collection Agency Act, and violation of the Illinois Consumer Fraud Act. *Id.*; *see generally* [3]. She seeks damages, as well as declaratory and injunctive relief. *Id.*

After the parties' efforts to settle the matter failed, Defendant moved for summary judgment on all claims, [65]. In response, Plaintiff cross-moved for summary judgment, [83].

## II. Analysis

Summary judgment remains proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

Parties' "cross-motions" for summary judgment "must be evaluated together, and the court may not grant summary judgment for either side unless the admissible evidence as a whole—from both motions—establishes that no material facts are in dispute." *Bloodworth v. Vill. of Greendale*, 475 F. App'x 92, 95 (7th Cir. 2012). A genuine dispute as to a material fact exists if, given the evidence, a fact finder could return a verdict for the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment bears the burden to show that no such genuine dispute exists. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

In evaluating a motion for summary judgment, this Court must "construe all facts and reasonable inferences in the light most favorable to the non-moving party." *See Cung Hnin v. TOA (USA), LLC*, 751 F.3d 499, 503–04 (7th Cir. 2014). The non-moving party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250. In doing so, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

A.     **Breach of Contract Claim**

The Court first addresses Plaintiff's claims in Count II.  To prove breach of contract under Illinois law, a plaintiff must show "(1) the existence of a valid and enforceable contract; (2) substantial performance by the plaintiff; (3) a breach by the defendant; and (4) resultant damages." *TAS Distrib. Co. v. Cummins Engine Co.*, 491 F.3d 625, 631 (7th Cir. 2007) (internal citation omitted).  Damages may be established by "an actual loss or measurable damages resulting from the breach." *Avery v. State Farm Mut. Auto. Ins. Co.*, 835 N.E.2d 801, 832 (Ill. 2005).  If a "plaintiff fails to establish any element of the cause of action, summary judgment for the defendant is appropriate." *Lewis v. Lead Indus. Ass'n*, 178 N.E.3d 1046, 1052 (Ill. 2020).  Here, the parties' dispute regarding the Release presents questions of contract interpretation, "the basic rules of which are well settled." *Cent. Contracting, Inc. v. Kenny Constr. Co.*, No. 11-cv-9175, 2015 WL 832267, *3 (N.D. Ill. Feb. 25, 2015).

Where "the facts are undisputed, interpretation of contractual language is a question of law" for the trial court. *Bodum USA, Inc. v. La Cafetiere, Inc.*, 621 F.3d 624, 631 (7th Cir. 2010) (citing *PSI Energy, Inc. v. Exxon Coal USA, Inc.*, 17 F.3d 969, 971 (7th Cir. 1994)); *see also Klein v. Caremark Int'l. Inc.*, 771 N.E.2d 1, 8 (Ill. App. Ct. 2002) (noting under Illinois law, the "[c]onstruction of a contract is a question of law that is reviewed *de novo*") (citing *Amalgamated Bank of Chi. v. Kalmus & Assocs., Inc.*, 741 N.E.2d 1078, 1083 (Ill. App. Ct. 2000)).  "The primary objective in construing a contract is to give effect to the intent of the parties." *Gallagher v. Lenart*, 874 N.E.2d 43, 58 (Ill. 2007).  If the terms "in a contract are clear and unambiguous, 'they

6

must be given their plain, ordinary and popular meaning,'" *Cent. Contracting*, 2015 WL 832267, at *3 (quoting *Thompson v. Gordon*, 948 N.E.2d 39, 47 (Ill. 2011)), and "the court will enforce it as written," *Curia v. Nelson*, 587 F.3d 824, 829 (7th Cir. 2009). Contracts terms are not ambiguous simply because each party insists that the contract language supports its position or because the parties disagree on its meaning. *Id.* (citing *Cent. Ill. Light Co. v. Home Ins. Co.*, 821 N.E.2d 206, 214 (Ill. 2004)).

Further, "when interpreting settlement contracts, Illinois courts routinely look to the intent of the parties in order to ascertain the scope and extent of the claims released." *Hagene v. Derek Polling Constr.*, 902 N.E. 1269, 1272 (Ill. App. Ct. 2009) (citing *Ainsworth Corp. v. Cenco, Inc.*, 437 N.E.2d 817, 822 (Ill. App. Ct. 1982)). "Particularly with a release," Illinois courts discern this intent "from the language used *and the circumstances of the transaction*." *Farmers Auto. Ins. Ass'n v. Kraemer*, 857 N.E.2d 691, 694 (Ill. App. Ct. 2006) (quotation omitted). The analyzing court remains "able to examine the circumstances surrounding the transaction" as described "without changing the terms or creating an ambiguity." *Hagene*, 902 N.E.2d at 1272 (citing *First Bank & Tr. Co. of Ill. v. Vill. of Orland Hills*, 787 N.E.2d 300, 310 (Ill. App. Ct. 2003)).

Plaintiff argues that Defendant breached the parties' settlement agreement by failing to submit a request for deletion of the tradeline regarding Plaintiff's former debt within 14 days of receiving the fully executed Release. [83] at 2. Defendant does not dispute that: (1) Defendant's attorney, Mr. Starzec, received a copy of the fully

7

executed Release on November 11, 2022; (2) that Defendant was required to request a deletion of the tradeline within 14 days of receipt of the fully executed Release; (3) that, after November 11, 2022, Defendant communicated to the Equifax, Experian, and TransUnion credit reporting agencies that the alleged debt was increasing in amount from month to month from November 2022 to January 2023; (4) and that Defendant did not submit a tradeline deletion request until January 24, 2023. [91] ¶¶ 25, 26, 34, 35.

Instead, Defendant argues that Plaintiff failed to satisfy a condition precedent[2] in the Release when her attorney sent the fully executed Release to Defendant's attorney and not Defendant itself, asserting that the Release required that Defendant "personally receive a copy, rather than its agent." [66] at 5. Since, according to Defendant, it never personally received a copy of the fully executed Release until January 24, 2023, the deletion request requirement did not trigger until that point. *Id.*

Paragraph 16 of the Release resolves this issue; it provides:

After receipt of a fully executed copy of this Release ARI will, within 14 days thereafter, request that the national credit reporting agencies (the "Credit Bureaus") to which it reports delete ARI's reporting of the trade line(s) associated with the Debt. The request will be submitted via a [sic] "Automated Universal Data Form". Katsis agrees that ARI's sole obligation with respect to credit reporting shall be to submit the request to remove ARI's reporting of the tradeline(s) associated with the Debt, and to provide Katsis' counsel a copy of the same upon submission.

---

[2] "Illinois courts have defined a condition precedent as 'an event which must occur or an act which must be performed by one party to an existing contract before the other party is obligated to perform.'" *Beal Bank Nev. v. Northshore Center THC, LLC*, 64 N.E.3d 201, 207 (Ill. App. Ct. 2016) (quoting *Maywood Proviso State Bank v. York State Bank & Tr. Co.*, 625 N.E.2d 83, 87 (1993)). The "obligations of the parties end in the event that a condition precedent is not satisfied." *Id.* (quoting *Maywood*, 625 N.E.2d at 87)).

[84] at 68–70.

Here, the terms of the Release are not ambiguous. The language plainly states that once Defendant received the Release, it had 14 days to submit the deletion request. This clause contains no text imposing a "personal" receipt requirement or any other limitations or special conditions on how Defendant should receive the executed agreement. Further, it remains well established in Illinois agency law that notice to an attorney may be imputed to the client. *See Silverberg v. Haji*, 33 N.E.3d 957, 972 (Ill. App. Ct. 2015) ("The law is well established that notice of an attorney is notice to the client who employs him, and that knowledge of an attorney is knowledge of or imputed to his client.") (quotation omitted); *Eckel v. Bynum*, 608 N.E.2d 167, 174 (Ill. App. Ct. 1992) ("Generally, notice to an attorney is notice to the client and knowledge of an attorney is knowledge of, or imputed to, the client, notwithstanding whether the attorney has actually communicated such knowledge to the client.").

Defendant offers no legal basis to circumvent the general principle that notice to its attorney can be imputed as notice to itself, only claiming that interpreting the Release to require personal receipt "does not violate public policy." [66] at 5. But the textual language of the Release provides no support for Defendant's assertion that Plaintiff had to ensure its personal receipt of the executed agreement rather than through Defendant's attorney. The Court sees no reason to infer such an extra-textual requirement which would run contrary the well-known principle in Illinois agency law described above.

Accordingly, because Defendant's arguments attempting to impose a condition precedent requiring its personal receipt of the Release fail, and Defendant does not contest its attorney received a copy of the fully executed agreement on November 11, 2022, Defendant definitively breached the terms of the Release by admittedly failing to: 1) submit a deletion request by November 25, 2022, as the Release required; and 2) failing to provide Plaintiff's attorney with a copy of the Automated Universal Data form ("AUD") until after this lawsuit was filed.  [66] at 5–6.

Turning to the elements of the contract claim, the uncontested facts demonstrate that Plaintiff has carried her burden to demonstrate: (1) the existence of a valid and enforceable contract; (2) substantial performance by the Plaintiff (through providing a fully executed copy of the Release to Defendant's attorney); (3) Defendant breached because its attorney admitted to receiving the fully executed copy on November 11, 2025, it did not submit the deletion request until January 24, 2023, and it did not timely provide a copy of the AUD to Plaintiff's attorney.

Nevertheless, Plaintiff's ability to establish damages, the fourth element of a breach of contract claim, requires a more nuanced analysis.  In her breach of contract claim (Count II), Plaintiff asks the Court to award compensatory damages and punitive damages.  [29] ¶ 78.  She also requests "attorney's fees and costs of this action," injunctive relief against Defendant, a "finding that Defendant breached the Agreement," and any other relief "the Court deems proper."  *Id*.  But in Plaintiff's Response to Defendant's statement of material facts, Plaintiff admits that she "cannot identify any actual damages incurred specifically as a result of [Defendant's]

alleged failure to timely submit a copy of the AUD to her attorney." [87] ¶ 45. Further, throughout her pleadings and deposition, Plaintiff only points to the following expenses as damages resulting from Defendant's breach: (1) a $1,000 fee paid to her attorney pursuant to a retainer agreement for the attorney to represent Plaintiff with respect to the state default judgment matter, squashing service, and settlement ([83-3], Ex. K); (2) $0.63 cents paid in postage to obtain her credit reports on or around November 17, 2022 ([83-1], Ex. B);[3] (3) a $100 fee paid to her attorney pursuant to a second retainer agreement for the attorney to correct unlawful credit reporting ([71] Ex. F); and (4) $4.60 paid in certified mail postage to send her dispute letter to TransUnion on or around January 18, 2023. [83] at 23. Plaintiff does not point to any other actual damages resulting from Defendant's untimely submission of the deletion request.[4]

Plaintiff's original retainer fee of $1,000 and $0.63 cents in postage clearly do not result from Defendant's breach of the Release agreement. First, Plaintiff entered into the retainer agreement with her attorney before the Release even went into effect on November 11, 2022. Generally, an expense cannot possibly flow from the breach of a contract not yet in existence, and Plaintiff's own position forecloses recovery of

---

[3] The Court recognizes that the parties dispute whether Plaintiff admits to actually paying for this postage. *See* [87] ¶ 41. But the Court finds, as explained below, that Plaintiff could not recover this expense here, so whether Plaintiff actually paid the $0.63 remains immaterial.

[4] In her Motion for Summary Judgment and Declaration, Plaintiff claims that she lost time in attempting to resolve the tradeline dispute, claiming that this also resulted in damages. But Plaintiff offers no evidence showing that this alleged "lost time" caused her *actual* damages and, thus, this type of damages cannot be considered. *See In re Ill. Bell Tel. Link-Up II*, 994 N.E.2d 553, 558 (Ill. App. Ct. 2013) (A "breach of contract action requires that a plaintiff establish an actual loss or measurable damages resulting from the breach in order to recover," and "a claimant's failure to prove damages entitles the defendant to judgment as a matter of law.") (quotation omitted).

the $0.63 cents she spent on postage.  Plaintiff argues, and the Court agrees, that the Release required Defendant to submit the tradeline deletion request on November 25, 2022.  But Plaintiff admits she incurred the postage cost on November 17, 2022—before Defendant breached the agreement.  Thus, that cost also cannot have resulted from Defendant's breach.

The $100 Plaintiff spent for the second retainer agreement with her attorney and $4.60 paid in certified mail postage to send her dispute letter to TransUnion on or around January 18, 2023, merit a different analysis.  Notably, Defendant concedes multiple times that it "does not seek summary judgment as to the remaining $104.60 in claimed actual damages."  [66] at 15 n.8; *see also* [92] at 14 n.13.  Generally, Illinois law recognizes "no common law principle allowing attorney's fees either as costs or damages," *Qazi v. Ismail*, 364 N.E.2d 595, 596 (Ill. App. Ct. 1977), and, therefore, "[u]nder Illinois law, attorneys' fees are recoverable only if they are allowed by the parties' contract or are authorized by statute."  *Lockett v. Freedman,* No. 03-cv-2992 2004 WL 856516, *3 (N.D. Ill. Apr. 21, 2004); *see also Evco Assocs. v. C.J. Saporito Plating Co.*, No. 93-cv-2038, 1993 WL 348691, *18 (N.D. Ill. Sept. 7, 1993) ("In Illinois, it is well established that 'attorney's fees and other costs of litigation are ordinarily not recoverable by the prevailing party unless specifically authorized by statute or contract.'") (quoting *Qazi*, 364 N.E.2d at 596); *Chi. Reg'l Port Dist. V. Ferroslag, Inc.*, 531 F.Supp. 401, 402 (N.D. Ill. 1982) ("Illinois law strictly limits the recoverability of attorneys' fees.") (citing *Qazi*, 364 N.E.2d at 596).

Here, Paragraph 7 of the Release provides that any "prevailing party shall be entitled to an award of attorneys' fees and costs in any action commenced to enforce this Release or any provisions therein." [84] at 68–70. Ostensibly, the parties assume that this provision requires that the attorney's fees must be counted as damages in an action brought to enforce the agreement. But applying Illinois law to this provision, as the Court must, demands a different result.

Again, in Illinois "the interpretation of a contract is a question of law" and further "[c]ontract provisions regarding attorney fees are to be strictly construed and enforced at the discretion of the [trial] court." *Turner v. Vill. of Sauk Vill.*, No. 1-16-3279, 2018 WL 1628413, at *5 (Ill. App. Ct. Mar. 30, 2018) (quoting *Mirar Dev., Inc. v. Kroner*, 720 N.E.2d 270, 274 (Ill. App. Ct. 1999)). When "construing the contract, 'the court must determine the intention of the parties with respect to the payment of attorney fees.'" *Mirar Dev.*, 720 N.E.2d at 274 (quoting *Jackson v. Hammer*, 653 N.E.2d 809, 817 (Ill. App. Ct. 1995)).

The contract states that a "*prevailing party*" may recover "attorneys' fees and costs in any action commenced to enforce this Release or any provisions therein." [84] at 68–70 (emphasis added). By definition, the term "prevailing party" presupposes a party brings a successful action to enforce the agreement. Given that "contract provisions regarding attorney fees are to be strictly construed," and Illinois law does not recognize any "common law principle allowing attorney's fees either as costs or damages," the Court cannot lawfully construe this provision of the Release to permit a party to preemptively count an award of costs and fees in their *prima facie* case for

13

breach of contact. *See Qazi v. Ismail*, 364 N.E.2d at 596. As a result, Plaintiff may not "count" the $100 as damages for the purposes of establishing a *prima facie* case for breach of contract—the $100 may be awarded only *after* Plaintiff prevails on the underlying action.

This leaves the $4.60 Plaintiff allegedly paid in certified mail postage on January 18, 2023, to send her reinvestigation request to TransUnion. The parties dispute whether Plaintiff actually expended this cost herself, as Plaintiff appeared to suggest in her deposition that the $4.60 was included in the $100 she paid her attorney,[5] while her later declaration attached to this Motion for Summary Judgment claims that she paid this cost herself. Plaintiff gave multiple contradictory answers regarding whether she had a personal obligation to pay $4.60 in postage on top of the $100 retainer fee. At one point, Plaintiff testified that she understood that the $100 was supposed to cover postage costs. *See* [64-1] 59:14–16. Later, under questioning by her attorney, Plaintiff then testified that the retainer agreement obligated her to reimburse her attorney for postage expended. *See id.* 138:14–17; 139:18–20. This statement aligns with the second Retainer Agreement Plaintiff signed with her attorney. *See* [83-3], Ex. K ("Client will pay a $100 flat fee to Kasalo, plus any costs for postage incurred in connection with communicating with the credit reporting

---

[5] *Compare* [64-1] 80:10–18, *with* [83-1], Ex. B ¶ 8 ("I paid certified mail postage of $4.60). Defendant argues that Plaintiff's declaration is a "sham affidavit" because it contradicts her prior deposition testimony. But a review of Plaintiff's entire deposition does not conclusively establish that the purpose of the declaration is to create an issue of fact where none exists. *See Craig v. Wrought Washer Mfg., Inc.*, 108 F.4th 537, 544 (7th Cir. 2024) (The Seventh Circuit has "encouraged district courts to consider the totality of the circumstances in evaluating the declaration of a moving party"). This case does not involve "contradictions so clear that the only reasonable inference was that the affidavit was a sham designed to thwart the purposes of summary judgment." *Castro v. DeVry Univ., Inc.*, 786 F.3d 559, 571 (7th Cir. 2015). Accordingly, the Court will not disregard Plaintiff's affidavit.

agencies and/or Absolute Resolutions Investments, LLC."). Nevertheless, Plaintiff did consistently testify that she paid the $100 fee to her attorney the same day she signed the retainer agreement but had not reimbursed her attorney for the postage costs as of the date of her deposition. *See* [64-1] 54:14–21; 160:20–161:5.[6]

Again, where "the facts are undisputed, interpretation of contractual language is a question of law" for the trial court. *Bodum USA*, 621 F.3d at 631. Here, the Retainer Agreement Plaintiff signed clearly states that she must pay "a $100 flat fee" to her attorney "*plus* any costs for postage incurred in connection with communicating with the credit reporting agencies and/or Absolute Resolutions Investments, LLC." [83-3], Ex. K (emphasis added). On its face, the terms of the agreement assign responsibility to Plaintiff to pay for postage fees on top of the fee to her attorney. That unambiguous term controls, regardless of Plaintiff's apparent misunderstanding of the terms of the contract.

Even if Plaintiff has yet to reimburse her attorney for the postage (*compare* [64-1] 80:10–18, *with* [83-1], Ex. B ¶ 8), she still maintains the obligation to personally pay for this expense. Since no party disputes that the $4.60 cost was actually paid, this expense qualifies as actual damage flowing from Defendant's breach and thus Plaintiff prevails on her breach of contract claim as a matter of law. Subsequently, since Plaintiff is the prevailing party in this action, she may also

---

[6] The Court notes that the line of questioning regarding damages from Plaintiff's deposition appeared to cause confusion concerning the definition of damages, whether a legal or factual question was being asked, and other points of clarification. Though not necessary to recount in detail here, the Court incorporates review of the transcript into its analysis and conclusion on this point.

recover the contractual attorney's fees included in the Release, totaling her damages on this claim to $104.60.[7]

Finally, the Court notes Plaintiff cannot recover punitive damages or emotional distress damages for this claim. Although the Complaint alleges that Plaintiff suffered "physical manifestations of emotional distress," ([29] ¶ 59), Plaintiff admits that she "cannot recall any specific date or time of when she lost sleep or cried, and admits: (1) she did not seek medical treatment for the alleged distress and (2) no one witnessed her alleged distress." [87] ¶ 43. In short, she has alleged no facts and presented no evidence to support a sufficient claim for damages resulting from mental suffering in a breach of contract case. *See Parks v. Wells Fargo Home Mortg., Inc.*, 398 F.3d 937, 940–41 (7th Cir. 2005) (Illinois "does not ordinarily allow punitive and emotional distress damages for breaches of contract. Damages for breach will not be given as compensation for mental suffering, except where the breach was wanton or reckless and caused bodily harm, or where defendant had reason to know, when the contract was made, that its breach would cause mental suffering for reasons other than mere pecuniary loss." (internal citations omitted)); *Denius v. Dunlap*, 330 F.3d 919, 929 (7th Cir. 2003) (noting the Seventh Circuit has "said that bare allegations by a plaintiff that the defendant's conduct made him 'depressed,' 'humiliated,' or the like are not sufficient to establish injury unless the facts underlying the case are so inherently degrading that it would be reasonable to infer that a person would suffer emotional distress from the defendant's action"). Because Plaintiff does not allege

---

[7] Again, Defendant did not seek summary judgment with respect to this exact amount. *See* [66] at 15 n.8; [92] at 14 n.13.

wanton or reckless conduct, and presents no facts establishing bodily harm, punitive damages and emotional distress damages remain unavailable.

In sum, with respect to the breach of contract claim in the Amended Complaint, Plaintiff's motion for summary judgment is granted in part and denied in part, and Defendant's motion for summary judgment is denied. Plaintiff is entitled to summary judgment on the issue of breach and summary judgment on damages with respect to the $104.60—$4.60 in actual damages, and $100 in attorney's fees she may recover pursuant to Paragraph Seven of the Release.

### B. FDCPA Claim

Plaintiff alleges that Defendant violated 15 U.S.C. §§ 1692d, e, and f by continuing to report Plaintiff's debt to the credit reporting agencies after November 25, 2022. To prevail on this claim, Plaintiff must establish that: (1) Defendant qualifies as a "debt collector" under the FDCPA; (2) Defendant took the actions complained of "in connection with the collection of any debt"; and "(3) those actions violated one of the FDCPA's substantive provisions." *Wood v. Sec. Credit Servs., LLC*, 126 F.4th 1303, 1311 (7th Cir. 2025) (quotation omitted). Defendant "does not dispute that the subject account constitutes a 'debt,' that Plaintiff constitutes a 'consumer,' and that [Defendant] constitutes a 'debt collector' as each of those terms are defined by the FDCPA." [92] at 2 n.2. Defendant also concedes that "its continued reporting technically violated the FDCPA," but instead asserts that "it is protected from liability under the bona fide error defense" under 15 U.S.C. § 1692k(c). [92] at 8.

17

To successfully assert a bona fide error defense, Defendant must establish that "(1) the violation was not intentional, (2) the violation resulted from a bona fide error, and (3) the debt collector maintained procedures reasonably adapted to avoid any such error." *Wood,* 126 F.4th at 1311. "Crucially, 'a defendant can invoke the bona fide error defense only if it claims it made an error of *fact*, not an error of *law*.'" *Id.* (quoting *Evans v. Portfolio Recovery Assocs.*, *LLC*, 889 F.3d 337, 349 (7th Cir. 2018), *abrogated by TransUnion LLC v. Ramirez,* 594 U.S. 413, 423 (2021)) (emphasis in original). Additionally, in this context, "'procedures' are 'processes that have mechanical or other such "regular orderly" steps to avoid mistakes.'" *Evans*, 889 F.3d at 350 n.9 (quoting *Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA*, 559 U.S. 573, 587 (2010)). A "thinly specified 'policy,' allegedly barring some action but saying nothing about what action to take, is [not] an adequate 'procedure' under § 1692k(c)." *Leeb v. Nationwide Credit Corp.*, 806 F.3d 895, 900 (7th Cir. 2015).

The bona fide error defense "does not require debt collectors to take every conceivable precaution to avoid errors; rather, it only requires reasonable precaution." *Kort v. Diversified Collection Servs., Inc.*, 394 F.3d 530, 539 (7th Cir. 2005). Seventh Circuit authority "reflect[s] a flexible, fact-specific approach to the reasonableness inquiry." *Abdollahzadeh v. Mandarich L. Grp.*, *LLP*, 922 F.3d 810, 817 (7th Cir. 2019). At the low "end of the spectrum," the Seventh Circuit has recognized the defense where "the defendant attempted to collect a debt that had been discharged in bankruptcy" but "had minimal procedures in place" to prevent that type of error, specifically relying "on a computerized search 'done . . . by another firm' and

18

a policy of 'prompt cessation of any attempt to collect a debt upon notification that it had been discharged.'" *Id.* at 817–18 (quoting *Ross v. RJM Acquisitions Funding LLC*, 480 F.3d 493, 495–97 (7th Cir. 2007)).  Other examples include account data "subjected to an automated scrub" by a third party that "supplied an affidavit attesting that the information in its report was correct," and then an attorney examining "the account to check whether a collection action" would be unlawful.  *Id.* at 818.

Here, Defendant "does not argue that its 'policy' told its employee what [he] *should have* done, much less that the policy gave [him] any 'mechanical' or 'regularly orderly' steps to follow."  *Leeb*, 806 F.3d at 900.  Instead, Defendant points to its policies and procedures, which directed its General Counsel to "ensure that ARI complied with the terms of" any settlement agreement.  [64-4] ¶ 5.  Defendant states that it maintained a policy that "[i]n the event a credit reported debt was released as part of any settlement agreement, General Counsel, in accordance with the particular terms of the executed settlement agreement, was required to instruct the Operations and Compliance Department to submit an [AUD] to the credit reporting agencies requesting deletion of the subject tradeline" or to take other necessary steps.  *Id.*  Defendant also notes that "this process was carried out by sending an email" to the correct address identified by the Department.  *Id.*

Simply put, these policies do not set out any "'mechanical' or 'regularly orderly' steps to follow."  *Leeb*, 806 F.3d at 900.  Notably, these policies as described by Defendant were followed—the parties do not dispute that once Defendant's general

19

counsel received the executed settlement agreement from Defendant's outside counsel, these exact steps were followed. The problem, instead, arose from the fact that Defendant, through its attorney, received the executed agreement in November 2022, but the attorney failed to provide the copy to Defendant's general counsel until January 2023, thus triggering the violation Defendant concedes. *See* [92] at 8. As such, Defendant's proffered policies say nothing regarding executing the settlement agreement, communication with any outside counsel, nor any reminders or communication requirements between Defendant, its attorneys, or any other parties to an agreement. In other words, since Defendant's policies do not even mention, much less constitute procedures to prevent, the type of mistake that occurred here, they can hardly be considered "reasonably adapted to avoid any such error." *Wood,* 126 F.4th at 1311.

Because Defendant is not entitled to a bona fide error defense and Defendant further admits "that its continued reporting technically violated the FDCPA," Plaintiff is entitled to summary judgment on her FDCPA claim as a matter of law. [92] at 8.[8] In her Amended Complaint, Plaintiff states that, as compensation for

---

[8] The Court notes that Defendant's arguments stating that its attorney bore responsibility to timely update Defendant's general counsel do not affect whether Defendant is responsible for the FDCPA violation. Further, Defendant's explanation that its own general counsel did not follow up himself because "he unfortunately forgot about the matter" cannot be construed as any defense supported by law. [92] at 10. Defendant states that "no such policy" directing its general counsel to follow up regarding the settlement agreement "exists for the simple reason that such a policy would conflict with ARI's policy that its General Counsel should have immediately alerted the Operations and Compliance Department to cease reporting without waiting on a fully executed copy of the agreement." *Id.* But this directive—that the general counsel did not need to wait for the fully executed agreement to trigger the policy—does not actually appear in the articulation of the policy Defendant submitted to the Court. *See* [64-4] ¶ 5; [87] ¶ 19. Instead, those policies direct the general counsel to act "in accordance with the particular terms of the executed settlement agreement," implying that the agreement itself must be executed before the general counsel should take the required steps. Based upon Defendant's own

Defendant's FDCPA violation, she seeks: (1) statutory damages pursuant to 15 U.S.C. § 1692k(a)(2); (2) actual damages pursuant to 15 U.S.C. § 1692k(a)(1); (3) costs and reasonable attorney's fees pursuant to 15 U.S.C. § 1692k(a)(3);[9] and (4) any other relief the Court finds appropriate.  [29] ¶ 59.

Plaintiff only points to her attorney's fees, postage costs, and "lost time" as damages she sustained while "trying to remove an adverse account from her credit report and prevent the account from harming her in the future."  [83] at 23.  Again, Plaintiff's original $1,000 retainer agreement and $0.63 cents in postage cannot be reasonably attributed to Defendant's violation here, since the violation stems from post-Release conduct and the parties had not yet executed the Release when Plaintiff incurred those expenses.  *See Thomas v. Law Firm of Simpson & Cybak*, 244 F. App'x 741, 743 (7th Cir. 2007) ("[O]nly losses flowing from an FDCPA violation are recoverable as actual damages."); *Crafton v. Law Firm of Jonathan B. Levine,* 957 F.Supp.2d 992, 1002 (E.D. Wis. 2013) ("[T]here must be a causal connection between the violation and the damages alleged.").

But "even a small amount of lost time" spent "in an attempt to mitigate the past and potential harm" from an "adverse" action on a "credit report" may "be a compensable harm . . . and provide a basis for awarding damages."  *Simonson v. IQ Data Int't Inc.*, 698 F.Supp.3d 1055, 1063 (W.D. Wis. 2023) (citing *Craftwood II, Inc. v. Generac Power Sys., Inc.*, 920 F.3d 479, 481 (7th Cir. 2019)).  Here, Plaintiff stated

---

policies, as articulated in Defendant's initial motion, the bona fide error defense remains unavailable to Defendant.

[9] The Amended Complaint cites § 1692k(a)(2) for this request, but the Court assumes that Plaintiff meant to refer to the relevant portion of the statute.

in her deposition that she lost time when accessing the credit report on two occasions. *See* [64-1] 89:23–94:4. Although these "injuries may have been slight," because an "identifiable trifle' suffices" as a concrete harm, Plaintiff's claim may proceed to trial on the issue of actual damages. *Craftwood II, Inc.,* 920 F.3d at 481 (quoting *U.S. v. SCRAP*, 412 U.S. 669, 689 n.14 (1973)).

Further, although the FDCPA's statutory damages provision "says 'the court,' the Seventh Circuit has held that '§ 1692k(a)(2) of the FDCPA provides for trial by jury in determining statutory additional damages.'" *Gillespie v. Blitt & Gaines, P.C.,* 123 F.Supp.3d 1029, 1033 (N.D. Ill. 2015) (quoting *Kobs v. Arrow Serv. Bureau, Inc.*, 134 F.3d 893, 898 (7th Cir. 1998)). The Court recognizes "that sending the question of statutory damages to the jury, with a maximum recovery of $1,000," plus very minimal actual damages, "may cause a waste of private and public resources that is difficult to justify." *Id.* at 1034. But the Seventh Circuit instructs that the FDCPA "does not require proof of actual damages as a precursor to the recovery of statutory damages. In other words, the Act is blind when it comes to distinguishing between plaintiffs who have suffered actual damages and those who have not." *Keele v. Wexler*, 149 F.3d 589, 593–94 (7th Cir.1998) (internal citations omitted).

Accordingly, Plaintiff's claim may proceed to trial on the issue of both actual and statutory damages since, as the Court has explained, issues of fact remain with respect to damages incurred in this matter.[10]

---

[10] The Court notes that Plaintiff also seeks costs and reasonable attorney's fees pursuant to 15 U.S.C. § 1692k(a)(2). But that statute provides that plaintiffs, "in the case of any successful action to enforce the foregoing liability," may recover "the costs of the action, together with a reasonable attorney's fee

### C.     ICAA and ICFA Claims

Although Plaintiff asserts claims under the Illinois Consumer Fraud Act ("ICFA") and Illinois Collection Agency Act ("ICAA"), she fails to present any arguments regarding these claims in her Motion for Summary Judgment, Response to Defendant's motion, or her Reply.  The Seventh Circuit instructs district courts not to summarily grant a defendant's motion under Rule 56, even where a plaintiff fails to respond to the motion in its entirety. *See Robinson v. Waterman*, 1 F.4th 480, 483 (7th Cir. 2021) (addressing a plaintiff prisoner's failure to file a timely response to the defendants' motion for summary judgment).  But it remains true that "[s]ummary judgment is not a dress rehearsal or practice run; it is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events." *Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 859 (7th Cir. 2005), *cert. denied*, 546 U.S. 1033, 126 S. Ct. 746, 163 L.Ed.2d 572 (2005) (internal quotations omitted).  Providing only a "sketched out" or "skeletal argument" or otherwise giving a claim "cursory treatment amounts to waiver of the claim." *Packer v. Trs. of Ind. Univ. Sch. of Med.*, 800 F.3d 843, 852 (7th Cir. 2015) (citing *Puffer v. Allstate Ins. Co.*, 675 F.3d 709, 718 (7th Cir. 2012)).

Here, Plaintiff fails to address either one of her state law claims in any of her filings, responses, or her reply brief.  The Court maintains no obligation to "research and construct the legal arguments open to parties, especially when they are

---

as determined by the court."  Because this case must proceed to trial on this issue of damages, the Court will not make any findings at this point on the issue of costs or fees.

represented by counsel." *Beard v. Whitley Cnty. REMC*, 840 F.2d 405, 408–09 (7th Cir. 1988) (quotation omitted); *see also Thomas v. Dart*, Case No. 22-cv-2026, 2025 WL 524170, at *4 (N.D. Ill. Feb. 18, 2025) ("This Court has no duty to do legal research for a litigant. The adversary system depends on the parties sticking up for themselves. The parties must assert their own rights, do their own research, and make their own arguments."); *Vaughn v. King*, 167 F.3d 347, 354 (7th Cir. 1999) ("It is not the responsibility of this court to make arguments for the parties.").

This is not a case where a plaintiff failed to file a timely response, but rather a repeated failure to develop these claims at all during the litigation process. Accordingly, Plaintiff's failure to develop or even address these claims must result in waiver at this stage. *See 330 W. Hubbard Rest. Corp. v. U.S.*, 203 F.3d 990, 997 (7th Cir. 2000) ("A party's failure to address or develop a claim in its opening brief constitutes a waiver of that claim, for it is not the obligation of this court to research and construct the legal arguments open to the parties, especially when they are represented by counsel. In order to develop a legal argument effectively, the facts at issue must be bolstered by relevant legal authority; a perfunctory and undeveloped assertion is inadequate to raise a separate basis for appeal.") (internal citations and quotations omitted). The Court grants Defendant's motion with respect to the claims brought under the ICAA and ICFA.

## D. Injunctive and Declaratory Relief

In her Amended Complaint, Plaintiff seeks declaratory and injunctive relief with respect to "whether the alleged debt may still be credit-reported on Plaintiff's

24

credit reports, and whether Plaintiff satisfied every condition and duty imposed on her by the Agreement." [29] ¶ 92. Specifically, Plaintiff seeks an injunction "to effect deletion of any current tradeline being credit reported" and "a declaratory judgment" concerning her compliance with the terms of the Release. *Id.* ¶ 95.

Plaintiff argues that these requests remain viable because Defendant maintains that she still fails to satisfy the condition precedent of the Release since she still has not personally ensured delivery of the executed agreement to Defendant itself. But the parties do not dispute that Defendant deleted the tradeline in January 2023 and the Court has already ruled on the interpretation of the contract above, holding that no such condition precedent exists. Accordingly, the point remains moot, and the Court denies Plaintiff's claims as moot. *See Cornucopia Inst. v. United States Dep't of Agric.*, 560 F.3d 673, 676 (7th Cir. 2009) ("[D]eclaratory judgment is appropriate only when the court's ruling would have an impact on the parties."); *Loertscher v. Anderson*, 893 F.3d 386, 392–93 (7th Cir. 2018) (In a claim "seeking injunctive relief, the requirement of a live controversy ordinarily means that, once the threat of the act sought to be enjoined dissipates, the [claim] must be dismissed as moot.") (internal quotation omitted).

## III. Conclusion

For the reasons explained above, the Court grants in part, and denies in part, the parties' cross motions for summary judgment. The Court grants Plaintiff's motion as to liability on both her breach of contract claim (Count II) and her FCPA claim (Count I) but finds that genuine issues of material fact remain with respect to damages. The Court grants Defendant's motion as to Plaintiff's ICAA and ICFA

claims (Counts III and IV) and enters judgment in Defendant's favor on those claims; the Court also dismisses as moot, Plaintiff's claim for injunctive and declaratory relief (Count V).

Date: February 12, 2026                    Entered:

                                           John Robert Blakey
                                           United States District Judge